**Lee Ann Donaldson**
OSB No. 093319
leeann@ladonaldsonlaw.com
Donaldson Law LLC
1211 SW 5th Ave. Ste 2250
Portland, OR 97204
(503)343-1300
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| THE ESTATE OF SKYE BASKIN, by and through its personal representative, TRAI BASKIN,<br><br>Plaintiff,<br><br>v.<br><br>STEPHANIE RIDGLEY, an individual, CHRISTIAN HUGHES, an individual, NICOLE TEIGEN, an individual, TENNILLE REDMOND, an individual, ANTHONY DEAN, an individual APRIL COMBS, an individual, STEPHANIE MORGAN, an individual JOHN DOES 1-10;<br><br>Defendant(s).<br><br>And<br><br>THE WELLPATH HOLDINGS, INC. LIQUIDATED TRUST, MATTHEW J. DUNDON, TRUSTEE,<br><br>Nominal Defendant | Case No.: 6:26-cv-683<br><br><br><br><br><br>**COMPLAINT FOR VIOLATION OF CIVIL RIGHT (42 U.S.C. §1983) AND SUPPLEMENTAL STATE CLAIMS**<br><br><br>**DEMAND FOR JURY TRIAL** |

PAGE 1 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

Plaintiff Trai Baskin, as personal representative of the Estate of Skye Baskin, and on behalf of all statutory beneficiaries thereof, including Trai Baskin and Ched Baskin, by and through the undersigned attorneys, hereby states and alleges as follows.

## INTRODUCTION

1.      This action arises out of the grossly inhumane confinement and deprivation of adequate medical care and mental health care for Skye Baskin, a twenty-seven-year-old man, who was a pretrial detainee in the Douglas County Jail.  Mr. Baskin's death followed six weeks and six days of neglect by the employees of the private for-profit medical contractor, Wellpath LLC ("Wellpath"), who failed to provide any medical or mental health services while Mr. Baskin was in custody.  During that time, Mr. Baskin lost approximately 100 pounds before he died of a fatal arrhythmia caused by metabolic derangement due to anorexia.

## JURISDICTION AND VENUE

2.      All acts complained of occurred in the U.S. District of Oregon.

3.      This action arises under the constitution and laws of the United States, and jurisdiction is based on Title 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(3), and Title 42 U.S.C. §1983. This court has personal and subject matter jurisdiction.

4.      This Court has pendent jurisdiction of the state law negligence claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in the U.S. District Court of Oregon, Eugene Division because the events giving rise to the claims occurred in Douglas County, State of Oregon.

## PARTIES

6.      At all times material to this cause of action, the Estate of Skye Baskin ("Estate") is being represented by Trai Baskin, as the duly appointed the personal representative for the Estate of Skye Baskin in Marion County case number 24PB05165.  Trai Baskin is a resident of North Carolina, and was properly appointed as the Personal Representative in Marion County, the State of Oregon on June 18, 2024.

PAGE 2 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

7.      Skye Baskin was born in Georgia in 1996.  At the time of his death, Skye Baskin was a citizen and a resident of the State of Oregon.  Skye Baskin died in Marion County on April 18, 2024, and the estate is established in that county.  He is survived by his brothers Ched Baskin and Trai Baskin.  At all times material, Skye Baskin was a pretrial detainee in Douglas County Jail and was in the process of being admitted to the Oregon State Hospital on the date of his death.

8.      Stephanie Ridgley, LPN ("LPN Ridgley") is a licensed nurse practitioner and was an employee of Wellpath.  At all times relevant she was acting in the course and scope of her employment with Wellpath at the Douglas County Jail and acting under the color of state law.  Upon information and belief, she is a citizen and resident of the State of Oregon.

9.      Christian Hughes, LCSW ("LCSW Hughes") is a licensed clinical social worker and employee of Wellpath working in the Douglas County Jail.  At all times relevant they were acting in the course and scope of her employment with Wellpath at the Douglas County Jail and acting under the color of state law.  Upon information and belief, she is a citizen and resident of the State of Oregon.

10.     Nicole Teigen, LPN ("LPN Teigen") is a licensed practical nurse and employee of Wellpath working in the Douglas County Jail.  At all times relevant she was acting in the course and scope of her employment with Wellpath at the Douglas County Jail and acting under the color of state law. Upon information and belief, she is a citizen and resident of the State of Oregon.

11.     Tennille Redmond, RN ("RN Redmond") is a registered nurse and employee of Wellpath working in the Douglas County Jail.  At all times relevant she was acting in the course and scope of her employment with Wellpath at the Douglas County Jail and acting under the color of state law.  Upon information and belief, she is a citizen and resident of the State of Oregon.

12.     Anthony Dean, LPN ("LPN Dean") is a licensed practical nurse and was an employee of Wellpath.  At all times relevant he was acting in the course and scope of his employment with Wellpath at the Douglas County Jail and acting under the color of state law.  Upon information and belief, he is a citizen and resident of the State of Oregon.

PAGE 3 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

13.     April Combs, MA ("MA Combs") is a medical assistant and was an employee of Wellpath.  At all times relevant she was acting in the course and scope of her employment with Wellpath at the Douglas County Jail and acting under the color of state law.  Upon information and belief, she is a citizen and resident of the State of Oregon.

14.     Stephanie Morgan, MA ("MA Morgan") is a medical assistant and was an employee of Wellpath.  At all times relevant she was acting in the course and scope of her employment with Wellpath at the Douglas County Jail and acting under the color of state law. Upon information and belief, she is a citizen and resident of the State of Oregon.

15.     Defendant Wellpath John Does one through ten are, at this time, unknown employees of Wellpath who at all times material to this cause of action were acting within the course and scope of their employment.  Plaintiffs are seeking the identity of Wellpath John Does One through Ten, who together, in part, or as part of their assigned duties, either wrongfully acted or failed to act in their care and treatment of Skye Baskin as alleged below.

16.     Nominal Defendant Wellpath Holdings, Inc. Liquidated Trust, Mathew J. Dundon, Trustee, is a Nominal Defendant hereto given Wellpath, LLC's bankruptcy discharge by the United States Bankruptcy Court for the Southern District of Texas.  Hereinafter "Defendant Wellpath".

17.     Specifically, by Order dated June 4, 2025, the Bankruptcy Court stated: "Holders of personal injury tort and wrongful death claims against the Debtors [including Wellpath, LLC] are subject to the Trust Distribution Procedures ("TPDs"), including the non-binding alternative dispute resolution process set forth therein to determine, if necessary, the allowed amount for the Claim.  **Such holders of personal injury and wrongful death claims may also seek determinations of the Debtor's liability by the appropriate civil court pursuant to 28 U.S.C. § 157(b)(5) with the Liquidating Trust as a nominal party** (a) to the extent such inclusion is necessary to recover against available third-party insurance proceeds or an unreleased non-Debtor Defendant or **(b) to establish or liquidate the amount of their claim for distribution under the Plan from the Liquidating Trust;** *provided, however*, outside of the Pro Rata distribution from

PAGE 4 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

the Liquidating Trust as well as recovery from any applicable insurance plan, the Holders of such claims may not seek satisfaction of, and are permanently enjoyed from seeking payment of, any judgment, award, settlement, claim, distribution, indemnification right, or any other payment amount resulting from their lawsuit from, or in connection with, the Debtors, the Debtors' estates, or the Post-Restructuring Debtors." (bold emphasis added, italic original).

18.     Defendant Wellpath was a private corporation that contracts with Douglas County to provide medical and mental health services at Douglas County Jail.  At all relevant times, Defendant Wellpath acted under color of state law and was responsible for employing and supervising medical and mental health professionals including Defendants Ridgley, Hughes, Teigen, Redmond, Dean, Combs, Morgan, and John Does 1-10.  Defendant Wellpath is liable under Oregon law for negligence and wrongful death, and under 42 U.S.C. §1983 for policies, customs, and practices that fostered deliberate indifference to the serious medical and mental health needs of adults in custody, including Mr. Baskin.

**FACTS OF THE CASE**

**The Relationship Between Wellpath and Douglas County**

19.     The Douglas County Jail houses pretrial detainees and persons convicted of crimes. Douglas County is obligated by state and federal law to provide medical care and mental health care for persons lodged in the Douglas County Jail.

20.     Douglas County first contracted with Correct Care Solutions, a predecessor of Wellpath LLC, in 2014 to provide health care to incarcerated individuals at Douglas County Jail, including medical care, psychiatric, and dental care.

21.     In securing the contract with Douglas County, Correct Care Solutions promised that its programs would meet or exceed all statewide standards and regulations in addition to national standards set by the National Commission on Correctional Health Care (NCCHS).  The NCCHS publishes "Standards for Health Services in Jails."

22.     NCCHC Jail Standard J-A-01 states that it is "essential" that inmates have access

PAGE 5 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

to care for their serious medical, dental, and mental health needs. Jail Standard J-A-01 provides that "[a]ccess to care means that, in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered." Jail Standard JA-01 notes that "[i]nmates must have access to care to meet their serious health needs." This is the fundamental principle on which all NCCHC standards are based and is the basic principle established by the U.S. Supreme Court in the *Estelle v. Gamble*, 429 U.S. 97 (1976). The standard gives several examples of "[u]nreasonable barriers to inmates' health services," including "[h]aving an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care."

23.    NCCHC Jail Standard J-E-02 states that it is "essential" that "[s]creening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met." Jail Standard J-E-02 provides that "[r]eception personnel [should] ensure that persons who are * * * mentally unstable * * * are referred immediately for care and medical clearance into the facility." The term "medical clearance" is defined as "a documented clinical assessment of medical, dental, and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to the hospital emergency room." The standard notes that "[i]nmates with mental disorders are often unable to give complete or accurate information in response to health status inquiries. Therefore, it is good practice for mental health staff to be involved in training staff who do the intake screening."

24.    NCCHC Jail Standard J-E-04 states that it is "essential" that "[i]nmates receive initial health assessments." Jail Standard J-E-04 provides that the initial health assessment should take place within 14 days of admission into the jail and should be done by a qualified healthcare professional. The standard explains that "[t]he health assessment is the process whereby an individual's health status is evaluated, including questioning the patient about symptoms. The extent of the health assessment is defined by the responsible physician but should include at least

the steps noted in this standard."

25.    NCCHC Jail Standard J-F-01 states that it is "essential" that "[p]atients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence-based standards." The standard provides that mood disorders and psychotic disorders are examples of the types of health conditions that fall under this standard.

26.    NCCHC Jail Standard J-F-03 states that it is "essential" that "[m]ental health services are available for all inmates who require them." Jail Standard J-F-03 explains that "[i]n the correctional setting, as in most other environments, the immediate objective of mental health treatment is to alleviate symptoms of mental disorders and prevent relapses in order to sustain patients' ability to function safely in their environment."

27.    NCCHC Jail Standard J-G-02 states that it is "essential" that "[a]ny practice of segregation should not adversely affect an inmate's health." The standard provides that, "[u]pon notification that an inmate has been placed in segregation, [a] qualified health care professional reviews the inmate's health record." Jail Standard J-G-02 explains that "[c]hecks by health staff must be done to ensure that each segregated inmate has the opportunity to request care for medical, dental, or mental health problems. These visits also enable health staff to ascertain the inmate's general medical and mental health status. Inmates often experience irritability, anxiety, or a dysphoric mood within weeks of placement in social isolation." Jail Standard JG-02 cautions that "[s]pecial attention should be given to vulnerable populations, such as adolescents and the mentally ill."

28.    The NCCHC also publishes "Standards for Mental Health Services in Correctional Facilities" ("NCCHC Mental Health Standards").

29.    NCCHC Mental Health Standard MH-E-07 states it is "essential" that "[t]he mental health of segregated inmates is monitored regularly." The standard provides, in relevant part,

        a. On notification that an inmate is placed in segregation, mental health staff reviews the inmate's mental health record to determine whether existing mental health

PAGE 7 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

needs contraindicate the placement or require accommodation. Such review is documented in the clinical record;

b. For inmates housed in segregation, qualified mental health professionals provide mental health services according to established treatment plans and respond in a timely manner to referrals; and

c. Inmates who are under *extreme isolation* with little or no contact with other individuals are monitored daily by medical staff and at least once a week by a qualified mental health professional.

The standard explains that "[t]he intent of this standard is that mental health staff monitor segregated inmates for signs of mental or physical decompensation. Persons in segregated environments are vulnerable to mental illness and often experience irritability, anxiety, or depression." The standard notes that "[i]t is important to coordinate procedures to ensure that segregated inmates who are on the mental health caseload are appropriately monitored and managed." It warns that "[b]ecause segregation can exacerbate preexisting conditions, staff should be extra cautious when placing vulnerable inmates in segregation." The standard also cautions that "[m]ental health staff should provide medical and custody staff with clear guidelines regarding behaviors, verbal statements, medication refusals, and cell conditions that require a mental health referral." The standard points out that "[m]any correctional systems screen for the presence of serious mental illness so that such inmates are not eligible for * * * long-term placement in segregation." All aspects of Mental Health Standard MH-E-07 should be addressed by written policy and defined procedures.

30.    NCCHC Mental Health Standard MH-G-03 states it is "essential" that a facility prepare individual mental health treatment plans for inmates and detainees in need of mental health treatment. A treatment plan is a series of written statements specifying a patient's particular course of therapy and roles of qualified mental health professionals in carrying it out. Mental Health Standard MH-G-03 requires that individual treatment plans address, at a minimum, (a) the frequency of follow-up for evaluation and adjustment of treatment modalities, (b) adjustment of

PAGE 8 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

medications as needed, (c) referrals for psychological testing, medical testing, and evaluation, as needed, (d) instructions relating to diet, hygiene, exercise, and adoption to correctional environment, and (e) the documentation of treatment goals and objectives, needed interventions to achieve goals, and clinical progress. Again, all aspects of Mental Health Standard MH-G-03 should be addressed by written policy and defined procedures.

31.     In securing its contract with Douglas County, Correct Care Solutions promised to conduct triage evaluations, pre-screening and intake, review of current and prior medical problems, and screenings for mental illness.

32.     In securing its contract with Douglas County, Correct Care Solutions promised that they would initiate a medical record for each inmate, and incorporate information from off-site providers.

33.     In securing its contract with Douglas County, Correct Care Solutions promised to provide health education and training to the Douglas County Sheriff's Office staff on medical issues, including recognizing signs and symptoms of mental illness.

34.     In 2019, Correct Care Solutions, LLC changed its name to Wellpath LLC.  Douglas County agreed to the name change on May 22, 2019.  Wellpath LLC has been registered to conduct business in Oregon since 2019.

35.     Douglas County and Wellpath LLC continued their contracts in 2021, 2022, 2023, and 2024.

36.     At the time of the events described herein Wellpath was contracted with Douglas County to provide comprehensive healthcare services, including medical care and mental health care to inmates of the Douglas County Jail for the term July 1, 2023, to June 30, 2024.

37.     On August 9, 2023, Douglas County and Wellpath LLC entered into a Fourth Amendment to the original contract that added a full-time employee mental health professional, stating:

The parties recognize there has been a demand for additional mental health services

PAGE 9 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

for the Adult Population.  In order to meet that demand, the parties agree to add an additional 1.00 FTE (40 hours) of Mental Health Professional to the contract, which will be grant-funded until September 30, 2025.  This position is *in addition* to the current Mental Health Professional services in the existing contrast." (emphasis original).

38.    Douglas County was awarded a federal grant by the Bureau of Justice Assistance to pay for this additional employee.

39.    The Fifth Amendment contract signed on February 7, 2024, removed 1 full time employee of Mental Health Professional from the staffing matrix and added 1 full time Discharge Planner.  As of February 7, 2024, the Adult Staffing Matrix included 3 hours a week by a psychiatrist, and two 10-hour shifts a week of a Mental Health Professional.

## SKYE BASKIN'S DETERIORATION, MALNOURISHMENT, AND WASTING AWAY AT DOUGLAS COUNTY JAIL

40.    Skye Baskin, an African-American male, born September 3, 1996, was booked for a misdemeanor offense in the Douglas County Jail on March 1, 2024, after he was found walking on Interstate 5.  At the time of his booking, Baskin had recently been in the hospital and still had evidence of a recent blood draw on his left arm, namely a cotton ball held tight with medical tape to the inside of his elbow.

41.    Earlier on March 1, 2024, Skye Baskin had been admitted to a local hospital on a Director's Hold request from the local sobering center.  At that time, the staff at the sobering center learned Skye Baskin reported hearing voices telling him to do things.  The staff at the sobering center noted he had stopped eating and drinking.  The doctors at the hospital diagnosed him with schizophrenia and gave him one dose of risperidone.

42.    Wellpath Defendants did not perform a receiving screening for either health needs or mental health needs assessment, or suicide screening for Skye Baskin at his booking, or at any

PAGE 10 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

time during his confinement.

43.    Wellpath Defendants did not perform an initial health assessment of Mr. Baskin, at booking, or at any time during his confinement at Douglas County Jail.

44.    Wellpath Defendants did not perform a mental health assessment and evaluation on Mr. Baskin at any time during his confinement at Douglas County Jail.

45.    Wellpath Defendants did not order any medical records from any outside medical providers, including the local hospital, even though Mr. Baskin was arrested with a hospital bracelet still affixed to his wrist.

46.    At the time of his booking Skye Baskin was 5'8" and 235 pounds. The booking officer from the Oregon State Police noted in his pre-jail paperwork that Mr. Baskin had an observable mental condition.

47.    At the time of intake, Mr. Baskin refused to follow directions from correctional staff, and would not answer any booking questions and would walk away from them.

48.    On March 2, 2024, at 07:55 the correctional staff transferred Mr. Baskin to isolation "because he appears to be having mental health issues." At 10:36, a Deputy noted "We will have Well Path medical (Stephanie) try to talk to him." In the inmate log the Deputy noted, "Well Path Medical (Staphanie)(sic) talked to Baskin. Baskin Said He does on(sic) take meds." At 10:52 the Corporal approved the transfer of Skye Baskin into isolation.

49.    Upon information and belief, the "Stephanie" or "Staphanie" refers to LPN Stephanie Ridgely. On March 2, 2024, Wellpath employee LPN Ridgely, did not perform a receiving screening for either health needs or mental health needs. LPN Ridgely did not document any screening or an examination, or any conversation she may have had with Skye Baskin, for medical or mental health clearance into the jail.

50.    Wellpath did not have a mental health staff review his mental health record to determine whether existing mental health needs contraindicated placement in segregation when he was initially placed in segregation. Upon information and belief, nothing was done to document,

PAGE 11 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

evaluate or treat any unknown mental health condition before transferring him to isolation.  LPN Ridgely did not document any interaction with Skye Baskin on March 2, 2024.

51.    Skye Baskin was in segregation from March 1, 2025 until April 18, 2024.  While in segregation Skye Baskin showed signs of mental disturbance through his non-participation in recreation, personal hygiene, and most problematic, his lack of nutrition and water intake.  His deterioration was noticed by jail staff, as reflected in the inmate logs.

52.    Upon information and belief, Wellpath Employee Defendants were instructed to use "Segregation Rounds Log" to monitor people in segregation.  The form has room for the staff person to write the date, their initials, observation numbers, and comments.  The observation numbers were categorized into the following categories:

| Subjective | Objective | Availability |
|---|---|---|
| 1.  No Complaints | 3.  Awake | 6. Out of Cell |
| 2.  Request Sick Call | 4.  Agitated | |
| | 5.  No Acute Distress | |

53.    On the morning round of March 3, 2024, MA Morgan noted Mr. Baskin was "on bunk" and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers. She did not write down any vitals.

54.    On the afternoon of March 3, 2024, MA Combs noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

55.    Arraignment for Mr. Baskin's misdemeanor charge was held on March 4, 2024, however, he refused to get out of his cell to go to the jail.  The jail staff had him attend arraignment by iPad.  The court appointed a public defender, and set bail.

56.    On the afternoon of March 4, 2024, LPN Dean noted Mr. Baskin was sleeping and

PAGE 12 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

indicated "1, 5" (No Complaints, No Acute Distress) as observation numbers.  He did not write down any vitals.

57.    No segregation rounds were performed on March 6, 2024, or if they were performed, nothing was noted in the record.

58.    On the afternoon of March 7, 2024, MA Combs noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

59.    On March 7, 2024, the court appointed attorney attempted a jail visit.  Mr. Baskin would not come to the visiting room.

60.    On the morning of March 8, 2024, RN Redmond noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  Redmond did not write down any vitals.

61.    On the afternoon of March 8, 2024, MA Combs noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

62.    On March 8, 2024, a jail staff noted that Skye Baskin refused to shower.

63.    On the morning of March 9, 2024, MA Morgan noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

64.    On the afternoon of March 9, 2024, MA Combs noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

65.    Jail staff noted on March 9, 2024, that Skye Baskin refused to shower.

66.    On the morning of March 10, 2024, MA Morgan noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

67.     On the afternoon of March 10, 2024, MA Combs noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers. She did not write down any vitals.

68.     On March 10, 2024 at 06:24, jail staff continued administrative segregation on March 10, 2024, again noting mental health concerns.

69.     Jail staff noted on March 10, 2024 at 07:52 "Shower refused. I asked him several times if he wanted to shower, Baskin did not answer me. Baskin stood up from his bunk but sat back down immediately.

70.     On the morning of March 10, 2024, MA Morgan noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers. She did not write down any vitals.

71.     On March 10, 2024 at 12:32 during a cell check jail staff noted that Mr. Baskin refused his lunch meal. "Asked several times, refused to get meal or answer me."

72.     On the afternoon of March 10, 2024, MA Combs noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers. She did not write down any vitals.

73.     On the afternoon of March 11, 2024, LPN Dean noted Mr. Baskin was standing in corner and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers. He did not write down any vitals.

74.     On afternoon of March 12, 2024, LPN Dean noted Mr. Baskin was sleeping and included "1, 5" (No Complaints, No Acute Distress) as observation numbers. He did not write down any vitals.

75.     On March 13, 2024, the deputy handling breakfast disbursement noted, "WHEN PASSING BREAKFAST I NOTICED BASKIN HAD A FOOD TRAY IN HIS CELL STILL. I TOLD BASKIN TO HAND OUT THE TRAY BEFORE HE COULD RECEIVE THE BREAKFAST. BASKIN IGNORED WHAT I WAS SAYING AND REFUSED TO TALK TO

PAGE 14 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

ME.  THE TRAY IS STILL IN HIS ROOM.  THE TRAY WILL NEED RETURNED AT LUNCH."

76.     On the afternoon of March 13, 2024, MA Combs noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

77.     On the afternoon of March 14, 2024, MA Combs noted Mr. Baskin was on his bunk and indicated "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

78.     On March 15, 2024, during a cell check, jail staff noted Mr. Baskin refused his lunch meal.

79.     No interactions were recorded with Mr. Baskin on March 15, 2024, by any Wellpath Employee.  He was still in isolation.

80.     By March 15, 2024, fourteen days after his initial booking, Wellpath defendants did not perform an initial health assessment by a qualified health care professional.  No medical, dental, and mental history was taken.  No vital signs were recorded.  No physical examination was performed.  Wellpath defendants did not perform a mental health assessment and evaluation.  No interview was noted including any history of Mr. Baskin's psychiatric hospitalization, psychotropic medication, or outpatient treatment.  At that time, Mr. Baskin had refused to shower twice and refused food at least three times.

81.     On the afternoon of March 16, 2024, LPN Teigan noted Mr. Baskin was at door and noted "1,3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

82.     On March 17, 2024, jail staff performed the administrative segregation review and continued authorizing Mr. Baskin's isolation due to mental health issues.

83.     On the afternoon of March 17, 2024, MA Morgan noted Mr. Baskin was "at door" and wrote "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did

PAGE 15 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

not write down any vitals.

84.     On March 18, 2024, jail staff noted Skye Baskin refused a shower.

85.     On the morning and afternoon of March 18, 2024, LPN Dean noted Mr. Baskin was "on bunk" and wrote "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  He did not write down any vitals.

86.     Wellpath defendants did not have any written observations noted of Mr. Baskin on March 19, 2024.

87.     On March 19, 2024, the circuit court found Mr. Baskin unable to aid and assist and ordered he undergo a Community Mental Health Consultation within seven days.

88.     Wellpath defendants did not have any written observations noted of Mr. Baskin on March 20, 2024.

89.     On the afternoon of March 21, 2025, MA Combs noted Mr. Baskin was on his bunk and wrote "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

90.     On the morning of March 22, 2024, RN Redmond noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) observation numbers.  They did not write down any vitals.

91.     On the afternoon of March 22, 2024, MA Combs noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

92.     On the morning of March 23, 2024, MA Morgan noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers.  She did not write down any vitals.

93.     On March 23, 2024, three weeks after being transferred into administrative segregation, Christian Hughes, LSCW performed the first "Mental Health Weekly Segregation Rounds" form.  The form has checkboxes with multiple optional selections for Orientation, Affect,

Mood, Cognition, Suicidal Ideation, Homicidal Ideation, Psych Meds, Behavior, Cell, along with space for remarks and initials. No selections were made by Hughes. She wrote "AIC standing in cell-naked- would not respond to his name being called- shook his head back & forth didn't appear to be in distress."

94. Neither Defendant Hughes, nor any other Wellpath Defendant mental health professional provided any mental health treatment to Mr. Baskin.

95. LSCW Hughes, and/or any other Wellpath mental health professional, failed to recognize Mr. Baskin's mental decompensation and report to custody officials his psychological deterioration, or take any other action to treat or refer Mr. Baskin out for treatment.

96. Jail staff performed the administrative segregation review on March 24, 2024, at 06:50 and continued authorizing Mr. Baskin's isolation due to mental health issues.

97. On March 24, 2024, at 12:33 during a cell check, jail staff noted Mr. Baskin refused his lunch meal, noting "Refused- Refused lunch tray/standing next to bed naked, refused to acknowledge me or come to door for tray."

98. In the afternoon of March 24, 2024, MA Morgan performed segregation rounds and noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as numerical descriptors. She did not write down any vitals.

99. Within 6 days of the order from the court, on the morning of March 25, 2024, a community mental health consultation with ADAPT Behavior Health Services met with Mr. Baskin cell side. Mr. Baskin nodded occasionally, but not in response to questions.

100. On March 25, 2024, during a cell check, a deputy noted Mr. Baskin refused his dinner meal. The Deputy noted, "REFUSED TO SPEAK TO ME OR GET TRAY WHEN OFFERED DINNER."

101. On the afternoon of March 25, 2024, LPN Dean wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors. He did not write down any vitals.

PAGE 17 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

102.     On March 26, 2024, the Report from the Community Mental Health Program was provided to the court.

103.     No Wellpath employee made any records for Mr. Baskin on March 26, 2024.

104.     On March 27, 2024, during a cell check, jail staff noted that Mr. Baskin refused his evening meal, "REFUSED MEAL.  WOULD NOT RESPOND WHEN ASKED 3 TIMES IF HE WANTED FOOD."

105.     On the afternoon of March 27, 2024, MA Combs performed segregation rounds and noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as descriptors.  She did not write down any vitals.

106.     On the afternoon of March 28, 2024, MA Combs performed segregation rounds and noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as descriptors.  She did not write down any vitals.

107.     On the morning of March 29, 2024 RN Redmond performed segregation rounds and noted Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as numerical descriptors.  They did not write down any vitals.

108.     On the afternoon of March 29, 2024, MA Combs performed segregation rounds and noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as numerical descriptors.  She did not write down any vitals.

109.     On morning of March 30, 2024, LPN Tiegan performed segregation rounds and noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as numerical descriptors.  She did not write down any vitals.

110.     On the afternoon of March 30, 2024, MA Morgan performed segregation rounds and noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as numerical descriptors.  She did not write down any vitals.

111.     Christian Hughes, LSCW completed a "Mental Health Weekly Segregation Rounds" form on March 30, 2024.  She did not note any Orientation, Affect, Mood, Cognition,

PAGE 18 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

Suicidal Ideation, Homicidal Ideation, Psych Meds, Behavior or Cell observations. She wrote, "AIC laying on bunk bed covered up w/ blanket." She did not make any other remarks. She did not provide any mental health treatment, or medical treatment. She did not inform custody officials of Mr. Baskin's physical or psychological deterioration, or other signs of his failing mental health. She did not refer him to any other medical provider.

112. On March 31, 2024, jail staff performed the administrative segregation review, and again kept it in place, noting mental health concerns and noted he used an iPad for court due to stability issues.

113. On March 31, 2024, MA Morgan performed segregation rounds. She noted Mr. Baskin was "on bunk" and "1, 3, 5" (No Complaints, Awake, No Acute Distress) as numerical descriptors. She did not write down any vitals.

114. On April 1, 2024, in the afternoon, LPN Dean performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors. He did not write down any vitals.

115. On April 2, 2024, in the afternoon, LPN Dean performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors. He did not write down any vitals.

116. No Wellpath employee made any record for Mr. Baskin on April 3, 2024.

117. On April 4, 2024, in the afternoon MA Combs made a segregation round and wrote Mr. Baskin was "walking around" and she wrote "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers. She did not write down any vitals.

118. In the morning of April 5, 2024, RN Redmond performed segregation rounds and wrote that Mr. Baskin was "at door" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors. She did not write down any vitals.

119. In the afternoon of April 6, 2024, MA Combs performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute

Distress) as number descriptors.  She did not write down any vitals.

120.    On April 6, 2024, at a cell check a deputy noted that Mr. Baskin refused his dinner meal and that a tray from lunch was still in the cell.

121.    Jail staff performed the administrative segregation review on April 7, 2024 at 07:08. They kept the status quo, again noting mental health concerns and pending stability issues.

122.    On April 7, 2024, in the afternoon MA Combs performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors.  She did not write down any vitals.

123.    On April 8, 2024, at 10:53 jail staff noted "Refused rec, he was sitting on his bunk naked refusing to talk to us."

124.    In the afternoon of April 8, 2024, LPN Dean performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors.  He did not write down any vitals.

125.    On April 8, 2024, at 19:59 a deputy noted Mr. Baskin, "REFUSED TO TAKE TRAY.  I PLACED A TRAY INSIDE ROOM. HAS NOT EATEN AND REFUSED TO HAND TRAY OUT.  I WILL ADVISE SGT HUEBERGER AND MEDICAL."

126.    On April 9, 2024, Skye Baskin refused to shower, as noted by jail staff.

127.    In the afternoon of April 9, 2024, LPN Dean performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors.  He did not write down any vitals.

128.    No Wellpath employee made any record of interaction with Mr. Baskin on April 10, 2024,

129.    No Wellpath employee made any record of interaction with Mr. Baskin on April 11, 2024.

130.    The court ordered Skye Baskin to the Oregon State Hospital on April 11, 2024.

131.    On April 11, 2024, at 18:35, a deputy noted that Mr. Baskin refused his dinner meal,

PAGE 20 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

and that he still had his lunch tray in the cell.

132. On April 12, 2024, a deputy noted that Mr. Baskin refused his dinner meal and that he did not move when he attempted to pass the dinner tray into the cell.

133. On April 12, 2024, in the morning RN Redmond performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors. She did not write down any vitals.

134. On April 12, 2024, jail staff also noted that Mr. Baskin refused a meal, "REFUSED TO ANSWER ME WHEN ASKED IF HE WANTED DINNER. DID NOT MOVE WHEN ATTEMPTING TO PASS TRAY IN TO CELL."

135. On April 13, 2024 at 09:52, a deputy noted, "Refused to answer me when asked if he wanted to shower."

136. In the morning of April 13, 2024, MA Morgan performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors. She did not write down any vitals.

137. In the afternoon of April 13, 2024, MA Combs performed segregation rounds and wrote that Mr. Baskin was "on bunk" and noted "1, 3, 5" (No Complaints, Awake, No Acute Distress) as number descriptors. She did not write down any vitals.

138. LSCW Hughes filled out a "Mental Health Weekly Segregation Rounds Form" on April 13, 2024. She did not complete any notations under Orientation, Affect, Mood, Cognition, Suicidal Ideation, Homicidal Ideation, Psych Meds, Behavior, or Cell conditions. She wrote "AIC laying on ground under bunk-did not respond to name."

139. LSCW Hughes did not identify and inform custody officials of Mr. Baskin's physical or psychological deterioration or his other symptoms of failing mental health. She did not provide any treatment for Mr. Baskin, she did not refer Mr. Baskin to any other medical or mental health providers.

140. On April 14, 2024, in the afternoon, MA Combs performed segregation rounds and

PAGE 21 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

noted Mr. Baskin was "at door" and wrote "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers. She did not write down any vitals.

141. In the afternoon of April 15, 2024, LPN Dean performed segregation rounds and wrote Mr. Baskin was "on bunk" and provided "1, 3, 5," (No Complaints, Awake, No Acute Distress) as observation numbers. He did not write down any vitals.

142. On April 15, 2024, 45 days after his first transfer to isolation, and six weeks of being in custody, Wellpath started filling out a "Medical Services Food and Vital Sign Monitoring hunger strike" form. At that time, he had already been refusing food for multiple days, on at least 12 occasions.

143. On April 15, 2024, Wellpath employee 7963, John Doe 1, noted at 19:10 that Mr. Baskin had not eaten any dinner.

144. On April 16, 2024, in the afternoon LPN Dean, filled out a segregation rounds log and wrote Mr. Baskin was "on bunk" and provided "1, 3, 5" (No Complaints, Awake, No Acute Distress) as observation numbers. He did not write down any vitals.

145. On April 16, 2024, Wellpath employee 7921, John Doe 2, noted that Mr. Baskin did not eat any lunch.

146. On April 16, 2024, at 18:47 jail staff noted "Refused dinner. Sat up on his bunk as if to accept it but then laid back down. Several verbal attempts were made to accept but Baskin would not get up to take his meal.

147. On April 16, 2024, Wellpath employee 7906, John Doe 3, noted Mr. Baskin did not eat any dinner.

148. On April 16, 2024, LPN Teigan faxed a transfer worksheet to the Oregon State Hospital. She noted "Refuses to dress and speak to custody staff, medical or mental health."

149. On April 17, 2025, at 10:37 a deputy noted that Skye Baskin refused to answer her and no shower was given.

150. Wellpath employee 7921, John Doe 2, noted on April 17, 2024, that Mr. Baskin

PAGE 22 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

refused lunch.

151.    Wellpath employee 7963, John Doe 1, noted on April 17, 2024, that Mr. Baskin did not eat any dinner.

152.    On the morning of April 18, 2024, Douglas County deputies prepared Mr. Baskin for transport to the Oregon State Hospital.  He was unable to dress himself and required the help of deputy sheriffs to do so.  Deputy sheriffs also assisted him into a wheelchair to be taken to the transport van.

153.    Mr. Baskin left Douglas County jail at approximately 8:11.  During the transport Mr. Baskin fell down off of the metal bench twice.  He picked himself up once.  The second time he fell he did not move from the ground.

154.    Mr. Baskin arrived at the Oregon State Hospital at approximately 10:47.  He was wheeled from the van into a room, where he was found unresponsive.  Emergency response was initiated, but was unsuccessful.  Skye Baskin was pronounced dead at 11:56 after approximately 40 minutes of attempting to revive him.

155.    The autopsy report revealed that Skye Baskin weighed 139 pounds at death.  This represented a loss of from his booking weight of 235 pounds, nearly 100 pounds in six weeks, six days. The cause of death was cardiac arrhythmia due to metabolic derangement due to anorexia (decreased oral intake) due to psychiatric disorder with psychotic features.

<u>WELLPATH'S HISTORY OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF JAIL INMATES AND DETAINEES OF PEOPLE HELD IN OREGON JAILS</u>

156.    In November 2013, Donnie Ray Brown died of a perforated duodenal ulcer in a local hospital, hours after his release from the Coos County Jail. He had been experiencing health problems for more than a week, including shortness of breath, vomiting, diarrhea, abdominal pain, leg swelling, and weakness. He was not taken to the hospital until he began vomiting blood. By

PAGE 23 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

that point, it was too late to save his life. During this time period, Wellpath/CCS (then known as Conmed) was providing the medical care at the Coos County Jail.

157.    In December 2017, Rocky Stewart died in the Coos County Jail after less than twelve hours in custody. The jail deputies knew that Mr. Stewart was vomiting repeatedly after being booked into the jail. The Wellpath/CCS registered nurse at the jail never saw Mr. Stewart, even though she was outside his cell in the booking area twice. The medical examiner determined that Mr. Stewart died of coronary artery disease, which could have been treated with medication or surgery if Mr. Stewart had been sent to the hospital. During this time period, Wellpath/CCS was providing the medical care at the Coos County Jail.

158.    In January 2018, Kathy Norman died in the Yamhill County Jail after a few hours in custody. Ms. Norman was transferred from the hospital, where she had a blood alcohol of 0.52 earlier in the day and had been receiving treatment for alcohol withdrawal. When she arrived at the jail, Ms. Norman told the jail staff that she was experiencing alcohol withdrawal. The Wellpath/CCS nurse on duty did not take her vital signs or perform a physical examination. The Wellpath/CCS nurse spoke by phone with a doctor, who never examined Ms. Norman or reviewed any medical records. Ms. Norman did not receive any medication or other treatment for alcohol withdrawal. She was placed in a medical observation cell, where she was found dead approximately four hours later. The medical examiner determined that her cause of death was complications of chronic beverage alcohol use.

159.    In September 2018, Janelle Butterfield committed suicide in the Josephine County Jail after forty days in custody. Ms. Butterfield had a history of severe mental illness that was known to the staff at the jail, including the medical and mental health providers. During her forty days in custody, Ms. Butterfield did not see a doctor, a nurse practitioner, a physician assistant, or a nurse. Ms. Butterfield was placed in a lock-down unit and was checked on once a day by people with EMT licenses working for Wellpath/CCS.

160.    In October 2019, Christina Ryan died in the Coos County Jail after sixteen hours in

PAGE 24 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

custody. When she was booked into the jail, Ms. Ryan was able to walk to the booking counter and talk to the jail staff. After she was placed in a holding cell, Ms. Ryan began to make incoherent noises and flail around in her cell. The Wellpath/CCS medical staff knew that Ms. Ryan was overdosing on methamphetamine but did not provide any meaningful medical care. Ms. Ryan ultimately died of acute methamphetamine intoxication. During this time period, Wellpath/CCS was providing the medical care at the Coos County Jail.

161.    In October 2020, Linda Brown died in the Columbia County Jail after eleven days in custody. Ms. Brown repeatedly asked the jail staff to take her to a hospital, but the jail staff referred her to the jail medical staff. Ms. Brown died of complications of liver cirrhosis due to chronic ethanolism. During this time period, Wellpath/CCS was providing the medical care at the Columbia County Jail.

## FIRST CAUSE OF ACTION

## AGAINST ALL INDIVIDUAL DEFENDANTS

### Violation of Fourteenth Amendment to the United States Constitution

### Pursuant to 42 U.S.C. § 1983 - Deliberate Indifference to Serious Medical Needs

162.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

163.    Defendants Ridgely, Hughes, Teigen, Redmond, Dean, Combs, Morgan, and Does 1-3 were deliberately indifferent to Skye Baskin's rights under the Eighth and/or Fourteenth Amendments to the U.S. Constitution in one or more of the following ways:

    a.  In failing to properly and fully medically screen Baskin at the time he was admitted to the Douglas County Jail;

    b.  In failing to properly and fully screen Baskin's mental health needs at the time he was admitted to the Douglas County Jail, including a suicide screening;

    c.  In failing to investigate Baskin's prior medical and mental health history through requesting records from the local hospital when he was found wearing a hospital

bracelet when he was arrested;

d. In failing to recognize that Skye Baskin was suffering from a mental health condition that required treatment;

e. In failing to provide Baskin with proper and basic medical and mental health care and treatment for his serious medical condition;

f. In failing to recognize that Baskin was not medically stable and was in need of mental health treatment;

g. In failing to recognize the deterioration of Baskin's mental health through his catatonic symptoms and escalating his mental and medical care to an outside or community provider;

h. In failing to develop an individualized treatment plan to manage his chronic disease (i.e.) psychotic disorder.

i. In failing to ensure that Baskin received access to qualified medical and mental health providers able to treat his condition, including by prescribing medication, and transferring Baskin, if necessary, to a facility equipped with such providers;

j. In failing review Baskin's mental health record at the time of the decision to place Baskin in segregation to see if it was contraindicated or required accommodation;

k. In failing to conduct daily medical examinations while Baskin was in administrative segregation;

l. In failing to conduct weekly mental health segregation rounds by a mental health professional each week Baskin was in administrative segregation;

m. In failing to monitor Baskin's calorie intake throughout his placement in segregation;

n. In failing to develop a plan to ensure that Baskin had sufficient nourishment after observing several days of missed meals;

o. In failing to transfer Baskin to a local hospital for a medical review when he was

observed to be not ingesting sufficient calories;

p.  In failing to observe and monitor Baskin's weight throughout his incarceration;

q.  In failing to monitor Baskin's vitals throughout his incarceration.

164.  As a direct result of the actions and inactions of the Defendants, and each of them, for six weeks and six days, Skye Baskin endured and suffered severe physical, emotional, and mental distress.  His mental health condition of schizophrenia was untreated, resulting in him refusing to eat, drink, or engage in recreation, causing him to waste away, losing nearly 100 pounds, and led to his ultimate death.  The beneficiaries of Baskin's estate are his brothers, who have been denied his love, society and companionship.  Baskin's estate is entitled to compensatory damages in an amount the jury determines is appropriate.

165.  The actions of defendants Ridgely, Hughes, Teigen, Redmond, Dean, Combs, Morgan, and Does 1-3 were recklessly and callously indifferent to Baskin's rights and physical safety, and punitive damages should be awarded in an amount the jury determines is appropriate.

166.  Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the process of this action.

## SECOND CLAIM FOR RELIEF

### Civil Rights Claim – 8th and/or 14th Amendments – 42 USC §1983

### *Monell* Claims

167.  Plaintiff realleges and incorporates herein, as though set forth in full paragraphs 1-167, above.

168.  Defendant Wellpath acted under color of state law, and at all relevant times, maintained policies, practices, customs, or deliberate failures to train and supervise that were the moving force behind the violation of Mr. Baskin's constitutional rights.

169.  Such policies, practices, and customs included, but were not limited to:

a.  A policy, custom, or practice of conducting improper or incomplete medical screening or mental health screening for individuals into the Douglas County Jail,

PAGE 27 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

including suicide screening;

b. A policy, custom, or practice failing to adequately train and supervise medical and mental health staff in the recognition and response to mental health deterioration while in isolation;

c. A policy, custom, or practice failing to monitor adults in custody's vital signs, including weight;

d. A policy, custom, or practice failing to ensure that adults in custody are consuming adequate nourishment;

e. A policy, custom, or practice failing to monitor an adult in custody's caloric intake after multiple meal refusals were noted;

f. A policy, custom, or practice failing to ensure that an adult in custody who refused a certain number of meals was transported to a hospital for a full medical work up and to have their nourishment needs met;

g. A policy, custom, or practice of providing insufficient medical coverage at the Douglas County Jail;

h. A policy, custom, or practice of providing insufficient mental health coverage at the Douglas County Jail;

i. A policy, custom, or practice of failing to ensure that Wellpath employees were properly trained to recognize and address the mental health needs of inmates and detainees; and

j. A policy, custom, or practice of failing to meet widely accepted community standards of care with regard to medical and mental health services for jail inmates and detainees.

170. The policies of Defendant Wellpath posed a substantial risk of harm to Douglas County inmates and detainees. Wellpath was aware of the risk.

171. As a direct result of the policies, customs, or practices of Wellpath set forth above,

Skye Baskin's mental health condition was not treated and he refused to eat or drink water throughout his six-week six day stay at Douglas County Jail. As a direct result of the policies, customs or practices of Wellpath, Skye Baskin endured and suffered severe physical, emotional and mental distress as his medical condition worsened, he wasted away, and lost nearly 100 pounds, leading to his ultimate demise. The beneficiaries of Baskin's estate are his brothers, who have been denied his love, society and companionship. Baskin's estate is entitled to compensatory damages in an amount the jury determines is appropriate.

172.    Defendant Wellpath's actions were recklessly and callously indifferent to Baskins' rights and physical safety. Punitive damages should be awarded in an amount the jury determines is appropriate.

173.    Plaintiff is entitled to his necessary and reasonable attorneys' fees and costs incurred in the prosecution of this action.

**THIRD CLAIM FOR RELIEF**

**Against all Defendants**

**Negligence**

174.    Plaintiff realleges and incorporates all previous paragraphs as if fully set forth herein.

175.    The actions of Defendant Wellpath, acting by and through its employees and agents, namely Ridgely, Hughes, Teigen, Redmond, Dean, Combs, Morgan, and Does 1-3 were negligent in one or more of the following particulars.

a.  In failing to properly and fully medically screen Baskin at the time he was admitted to the Douglas County Jail;

b.  In failing to properly and fully screen Baskin's mental health needs at the time he was admitted to the Douglas County Jail, including a suicide screening;

c.  In failing to investigate Baskin's prior medical and mental health history through requesting records from the local hospital when he was found wearing a hospital

PAGE 29 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

bracelet when he was arrested;

d.  In failing to recognize that Skye Baskin was suffering from a mental health condition that required treatment;

e.  In failing to provide Baskin with proper and competent medical and mental health care and treatment for his serious medical condition;

f.  In failing to recognize that Baskin was not medically stable and was in need of mental health treatment;

g.  In failing to recognize the deterioration of Baskin's mental health through his catatonic symptoms and escalating his mental and medical care to an outside or community provider;

h.  In failing to ensure that Baskin received access to qualified medical and mental health providers able to treat his condition, including by prescribing medication, and transferring Baskin, if necessary, to a facility equipped with such providers;

i.  In failing to develop an individualized treatment plan to manage his chronic disease (i.e.) psychotic disorder;

j.  In failing review Baskin's mental health record at the time of the decision to place Baskin in segregation to see if it was contraindicated or required accommodation;

k.  In failing to conduct daily medical examinations while Baskin was in administrative segregation;

l.  In failing to conduct weekly mental health segregation rounds by a mental health professional each week Baskin was in administrative segregation;

m.  In failing to monitor Baskin's calorie intake throughout his placement in segregation;

n.  In failing to develop a plan to ensure that Baskin had sufficient nourishment after observing several days of missed meals;

o.  In failing to transfer Baskin to a local hospital for a medical review when he was observed to be not ingesting sufficient calories;

PAGE 30 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

p.  In failing to observe and monitor Baskin's weight throughout his incarceration;

q.  In failing to monitor Baskin's vitals throughout his incarceration;

r.  In failing to provide sufficient medical coverage at the Douglas County Jail;

s.  In failing to provide sufficient mental health coverage at the Douglas County Jail;

t.  In failing to ensure employees of Wellpath were properly trained to recognize and address the mental health needs of inmates and detainees;

u.  In failing to ensure that the policies and practices for Wellpath specific to Douglas County Jail met widely accepted community standard of care with regard to medical and mental health services for jail inmates and detainees.

176.    As a direct result of the actions and inactions of the Defendants, and each of them, for six weeks and six days, Skye Baskin endured and suffered severe physical, emotional, and mental distress.  His mental health condition of schizophrenia was untreated, resulting in him refusing to eat, drink, or engage in recreation, causing him to waste away, losing nearly 100 pounds, and led to his ultimate death.  The beneficiaries of Baskin's estate are his brothers, who have been denied his love, society and companionship.  Baskin's estate is entitled to compensatory damages in an amount the jury determines is appropriate.

177.    Although Wellpath LLC is a private company, notice pursuant to the Oregon Tort Claims Act was provided to Defendant Wellpath within the time prescribed by law.

### THIRD CLAIM FOR RELIEF

### Gross Negligence

178.    Plaintiff realleges and incorporates all previous paragraphs as if fully set forth herein.

179.    Defendant Wellpath, by and through its employees acting within the scope of their employment, was grossly negligent and acted with reckless misconduct in one or more of the following particulars:

a.  In failing to properly and fully medically screen Baskin at the time he was admitted

PAGE 31 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

to the Douglas County Jail;

b.  In failing to properly and fully screen Baskin's mental health needs at the time he was admitted to the Douglas County Jail, including a suicide screening;

c.  In failing to investigate Baskin's prior medical and mental health history through requesting records from the local hospital when he was found wearing a hospital bracelet when he was arrested;

d.  In failing to recognize that Skye Baskin was suffering from a mental health condition that required treatment;

e.  In failing to provide Baskin with proper and competent medical and mental health care and treatment for his serious medical condition;

f.  In failing to recognize that Baskin was not medically stable and was in need of mental health treatment;

g.  In failing to recognize the deterioration of Baskin's mental health through his catatonic symptoms and escalating his mental and medical care to an outside or community provider;

h.  In failing to ensure that Baskin received access to qualified medical and mental health providers able to treat his condition, including by prescribing medication, and transferring Baskin, if necessary, to a facility equipped with such providers;

i.  In failing to develop an individualized treatment plan to manage his chronic disease (i.e.) psychotic disorder;

j.  In failing to review Baskin's mental health record at the time of the decision to place Baskin in segregation to see if it was contraindicated or required accommodation;

k.  In failing to conduct daily medical examinations while Baskin was in administrative segregation;

l.  In failing to conduct weekly mental health segregation rounds by a mental health

PAGE 32 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS

professional each week Baskin was in administrative segregation

m. In failing to monitor Baskin's calorie intake throughout his placement in segregation;

n. In failing to develop a plan to ensure that Baskin had sufficient nourishment after observing several days of missed meals;

o. In failing to transfer Baskin to a local hospital for a medical review when he was observed to be not ingesting sufficient calories;

p. In failing to observe and monitor Baskin's weight throughout his incarceration;

q. In failing to monitor Baskin's vitals throughout his incarceration;

r. In failing to provide sufficient medical coverage at the Douglas County Jail;

s. In failing to provide sufficient mental health coverage at the Douglas County Jail;

t. In failing to ensure employees of Wellpath were properly trained to recognize and address the mental health needs of inmates and detainees;

u. In failing to ensure that the policies and practices for Wellpath specific to Douglas County Jail met widely accepted community standard of care with regard to medical and mental health services for jail inmates and detainees.

180. As a direct result of the actions and inactions of the Defendants, and each of them, for six weeks and six days, Skye Baskin endured and suffered severe physical, emotional, and mental distress. His mental health condition of schizophrenia was untreated, resulting in him refusing to eat, drink, or engage in recreation, causing him to waste away, losing nearly 100 pounds, and led to his ultimate death. The beneficiaries of Baskin's estate are his brothers, who have been denied his love, society and companionship. Baskin's estate is entitled to compensatory damages in an amount the jury determines is appropriate.

181. The actions of Defendant Wellpath were grossly negligent and recklessly and callously indifferent to Baskin's rights and physical safety. Punitive damages should be awarded in an amount the jury determines is appropriate.

**WHEREFORE**, Plaintiff Trai Baskin and The Estate of Skye Baskin pray for judgment against Defendants as follows:

1.  As to all Individual Defendants, compensatory damages in an amount to be determined at trial; including punitive damages against each of them;

2.  Pre-death pain and suffering damages for the conscious physical and emotional pain and suffering Skye Baskin endured prior to his death;

3.  As to the Nominal Defendant, to establish or liquidate the amount of Plaintiff's claim for distribution under the confirmed Bankruptcy Plan from the Liquidating Trust in accordance with the Bankruptcy court's June 4, 2025 Order.

4.  Plaintiff's attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988 and other applicable law;

5.  Pre- and post-judgment interest as allowed by law;

6.  Any other relief as is just and proper.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL

Dated April 6, 2026

/s/ Lee Ann Donaldson

Lee Ann Donaldson, OSB No. 093319
DONALDSON LAW LLC
1211 SW 5TH Ave, Ste 2250
Portland, OR 97204
(503)343-1300
leeann@ladonaldsonlaw.com
*Counsel for Plaintiff*

PAGE 34 – COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND SUPPL. STATE CLAIMS